# EXHIBIT A

# United States Court of Appeals
## For the First Circuit

No. 23-1290

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

HAYDÉE YOLANDA SANCHEZ-DIAZ MONGE,

Relief Defendant, Appellant,

LUIS JIMENEZ CARRILLO, AMAR BAHADOORSINGH, JUSTIN ROGER WALL,
and JAMIE SAMUEL WILSON,

Defendants,

MARTHA Y. JIMENEZ TRUST and CHARLES A. CARRILLO TRUST,

Relief Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Kayatta, Howard, and Rikelman,
Circuit Judges.

Brooks T. Westergard, with whom Jacob S. Frenkel and Dickinson
Wright PLLC were on brief, for appellant.

Stephen Silverman, Appellate Counsel, with whom Megan
Barbero, General Counsel, Michael A. Conley, Solicitor, and Kerry
J. Dingle, Senior Appellate Counsel, were on brief, for appellee.

December 7, 2023

**RIKELMAN**, **Circuit Judge**.   In 2009, Yolanda Sanchez-Diaz divorced Luis Jimenez Carrillo and entered into a typical marital termination agreement, which included child support for the couple's five-year-old son and limited spousal support for her. After Carrillo moved away, they modified this agreement in 2016. Under the modified terms, Sanchez-Diaz took full physical and legal custody of their son and received increased child support and help with other expenses, including a new car.

In 2021, the Securities and Exchange Commission (SEC) sued Carrillo for securities violations he allegedly committed well after the couple divorced.  It named Sanchez-Diaz as a relief defendant in the suit and sought to recover from her the value of the new car she had received four years earlier, claiming Carrillo paid for it with illicit funds.  The SEC did not accuse Sanchez-Diaz of any wrongdoing but argued she had no legitimate claim to the car because she had not provided any consideration for it. The district court agreed and ordered her to pay almost $170,000, including interest.  Because we conclude that the district court applied the wrong legal standard in evaluating the SEC's arguments and that Sanchez-Diaz provided value for the car by assuming full-time care for the couple's son for six years, we reverse.

## I. BACKGROUND

## A. Relevant Facts

Sanchez-Diaz married Defendant Luis Jimenez Carrillo in 2001.  The couple lived in California and had one child, a son, who was born in 2003.  In July 2009, Sanchez-Diaz and Carrillo divorced and executed a marital termination agreement in California's San Diego Superior Court.  The agreement required Carrillo to pay $1,500 per month in child support and $3,139 per month in spousal support, with the last spousal support payment due on August 1, 2012.  It also provided for shared physical custody of their son, who at the time was five years old; Carrillo took care of their son every other weekend, and the parents alternated school holidays, vacations, and the son's birthday.  In December 2009, Sanchez-Diaz and Carrillo executed an addendum to the marital termination agreement that extended spousal support payments for an additional six months, such that payments would end in February 2013.

In late 2013, Carrillo moved to Mexico.  Sanchez-Diaz, who continues to reside in California, has had sole legal and physical custody of their son since early 2014.

In March 2016, when their son was almost thirteen years old, Sanchez-Diaz and Carrillo executed in Mexico a modified child support agreement, which they said reduced to writing their actual arrangement for their son's care since Carrillo had moved away.

Under the modified agreement, Sanchez-Diaz agreed to full legal and physical custody of their son.   Carrillo agreed to pay increased child support of $10,000 per month, to pay for the medical and educational expenses of their son, to cover the repairs and maintenance for the home where Sanchez-Diaz and their son lived, and -- central to this case -- "to purchase a new vehicle and to sign ownership of it over to [Sanchez-Diaz] every three years."  The agreement explicitly omitted any spousal support and was set to expire when Carrillo and Sanchez-Diaz's son turned nineteen or when he began university studies, whichever occurred earlier.

In April 2017, Sanchez-Diaz received from Carrillo a 2017 BMW X5 M per their agreement.  Around March or April 2020, she traded in the 2017 BMW and replaced it with a 2020 BMW X5 M.

### B. Legal Proceedings

In August 2021, the SEC brought a securities enforcement action in the District of Massachusetts against Carrillo and three other named defendants, alleging they engaged in a multi-year securities fraud scheme.  According to the complaint, from 2013 to 2019, Carrillo defrauded investors by concealing that he, in concert with his co-defendants and others, controlled the securities of multiple publicly-traded companies.

The complaint named Sanchez-Diaz, along with two trusts, as relief defendants.  The SEC did not allege any wrongdoing by

Sanchez-Diaz, but it sought equitable relief from her.  It claimed that, in April 2017, Carrillo directed one of his offshore asset managers to transfer $134,500 to a car dealership to purchase the 2017 BMW, which was titled to Sanchez-Diaz.  As a result, the SEC asserted, Sanchez-Diaz "received proceeds of the defendants' unlawful acts, practices and schemes and should not be entitled to retain those illegally-derived proceeds."

The district court entered a partial consent judgment between the SEC and Sanchez-Diaz, in which she agreed not to contest that Carrillo purchased the BMW with funds from the alleged fraud.  That left as the only open issue whether Sanchez-Diaz should be ordered to disgorge any ill-gotten gains she received.

Shortly thereafter, the SEC moved for an order requiring Sanchez-Diaz to pay disgorgement of $134,500, which represented the purchase price of the 2017 BMW, plus $35,304 in prejudgment interest, for a total of $169,804.  The SEC argued that Sanchez-Diaz had no equitable claim to the car because the 2016 agreement "recite[d] no consideration" for Carrillo's promise to buy the car.  It maintained that the car was merely a gift from Carrillo and that a relief defendant cannot keep a gift purchased with illegal profits.

Sanchez-Diaz opposed the motion, arguing that she provided valuable consideration for the BMW and, accordingly, had a legitimate claim to it.  Specifically, she contended that

California law creates a legal presumption that she provided value for the car because it instructs that the mutual consent of parties who enter into a separation and support agreement is sufficient consideration for that agreement. She also submitted a declaration explaining that, in exchange for Carrillo's financial obligations under the agreement, which were undertaken for the benefit of the parties' son, she accepted full legal and physical custody of their son.

The district court granted the SEC's disgorgement motion. SEC v. Carrillo, 656 F. Supp. 3d 354, 356 (D. Mass. 2023). It concluded that the SEC satisfied its burden by showing that Sanchez-Diaz received ill-gotten funds in the form of the 2017 BMW and that she did not have a legitimate claim to those funds. Id. at 355. It determined that the question before it was not "whether there existed 'consideration' in the contract law sense but whether Sanchez[-]Diaz provided substantially equivalent value in the bankruptcy law sense." Id. at 355-56. Applying that framework, the district court found as a matter of fact that "conspicuously absent in Sanchez[-]Diaz['s] defense is any persuasive argument that [she] 'provided services or value in exchange for' the BMW." Id. at 355 (quoting SEC v. Knox, No. 18-12058, 2022 WL 1912877, at *4 (D. Mass. June 3, 2022)). The district court also stated that Sanchez-Diaz's declaration did not "persuade[] [it] that she provided goods, services, or other substantially equivalent value

-7-

in exchange for the BMW." Id. at 356.  It held that disgorgement was therefore appropriate and ordered Sanchez-Diaz to pay $169,804.  Id.

Sanchez-Diaz timely appealed the district court's disgorgement order.

## II. STANDARD OF REVIEW

"Disgorgement is an equitable remedy," and "[t]he availability of an equitable remedy presents a question of law engendering de novo review." In re PHC, Inc. S'holder Litig., 894 F.3d 419, 435 (1st Cir. 2018).  Accordingly, we review de novo Sanchez-Diaz's primary contention that disgorgement is not an equitable remedy available to the SEC.  Because her contention that she has a legitimate claim to the car also must be "valid in fact," however, we review for clear error the district court's factual finding that she provided nothing of value in exchange for the car.[1]  See CFTC v. Kimberlynn Creek Ranch, Inc., 276 F.3d 187, 192 (4th Cir. 2002) (reviewing for clear error factual findings entered after a hearing held to determine the legitimacy of a relief defendant's claim to ill-gotten funds).[2]

_____

[1] The SEC conceded at oral argument, in two separate exchanges, that the district court found that Sanchez-Diaz provided no value for the car.

[2] In In re PHC, we first exercised de novo review and concluded that disgorgement was available.  894 F.3d at 438.  We then evaluated under an abuse of discretion standard whether the district court had properly tailored the scope of the disgorgement order to address the wrongdoer's conduct.  Id. at 438-39.  Here,

### III. DISCUSSION

Sanchez-Diaz urges us to reverse the district court, arguing primarily that she provided something of value in exchange for the BMW and, therefore, has a legitimate claim to it.  She also contends that the district court erred in relying on bankruptcy law principles to evaluate the legitimacy of her claim.

Her arguments raise an issue of first impression for this court: When does a relief defendant have a legitimate claim to property purchased with ill-gotten funds such that equitable disgorgement would be unjustified?  We begin our analysis by setting forth the correct legal standard for evaluating whether disgorgement against a relief defendant is an available equitable remedy.  We then apply that standard to this case.

### A. When Is Equitable Disgorgement Available Against Relief Defendants?

The SEC proceeds against Sanchez-Diaz as a relief defendant.  As the SEC acknowledges, relief defendants are "third-party non-wrongdoers."  SEC v. Ahmed, 72 F.4th 379, 407 (2d Cir. 2023).  "In the context of securities enforcement actions, [they] are individuals who are not accused of having violated the

---

by contrast, scope of relief is not at issue.  Instead, after setting out its understanding of the legal test for the availability of disgorgement, the district court concluded as a matter of fact that Sanchez-Diaz provided no value in exchange for the car.  Consistent with our precedent, we review that factual finding for clear error.  See United States v. Maglio, 21 F.4th 179, 186 (1st Cir. 2021).

securities laws themselves, but who are believed to be in possession of profits from such violations." SEC v. Smith, 710 F.3d 87, 90 n.2 (2d Cir. 2013). Consistent with this understanding, the SEC has never contended that Sanchez-Diaz engaged in any wrongful conduct or that she had any knowledge of Carrillo's alleged fraud. Indeed, according to the complaint in the underlying enforcement action, Carrillo's fraudulent scheme started six years after he and Sanchez-Diaz separated.

We have not previously articulated a legal rule about when a relief defendant in a securities enforcement action may be subject to equitable disgorgement. The Second Circuit, however, has set forth such a rule. Under its precedent, "[f]ederal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998). Several other circuits have adopted this rule as setting forth the two critical conditions that must be satisfied for a court to order equitable disgorgement against a relief defendant. See, e.g., Kimberlynn Creek Ranch, 276 F.3d at 192 (quoting Cavanagh); SEC v. George, 426 F.3d 786, 798 (6th Cir. 2005) (same); SEC v. Colello, 139 F.3d 674, 677 (9th Cir. 1998) (employing similar rule); SEC v. Cherif, 933 F.2d 403, 414 n.11

(7th Cir. 1991) (same).  Importantly, the parties agree this two-part rule controls here.

        After careful review, we conclude this two-part rule makes good sense in light of the plain language of the applicable statute, the equitable principles behind disgorgement, and the nature of relief defendants.  First, the Securities and Exchange Act permits the SEC to seek, and courts to order, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).  The statute specifically provides for disgorgement, stating that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any [f]ederal court may order, disgorgement."  Id. § 78u(d)(7).  Federal courts have jurisdiction to "require disgorgement" under that provision "of any unjust enrichment by the person who received such unjust enrichment as a result of" a securities law violation.  Id. § 78u(d)(3)(A)(ii) (emphasis added); see also George E. Palmer, Law of Restitution § 1.1 (3d ed. 2023) (defining unjust enrichment as "a very broad and flexible equitable doctrine, based on the principle that it is contrary to equity and good conscience for the defendant to retain a benefit that has come to [them] at the expense of the plaintiff").

        Second, courts considering disgorgement orders in securities enforcement actions have focused on the equitable

principle of unjust gain.  They have imposed disgorgement as a remedy to "forc[e] a defendant to give up the amount by which [they were] unjustly enriched" through violations of securities laws. SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) (first alteration in original) (quoting FTC v. Bronson Partners, LLC, 654 F.3d 359, 372 (2d Cir. 2011)); see also SEC v. Sargent, 329 F.3d 34, 40 (1st Cir. 2003); Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages, Equity, Restitution § 4.1(1) (3d ed. 2018) (noting that the remedy of disgorgement is measured by a defendant's unjust gains).  As they have explained, a function of disgorgement is to "recover ill[-]gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." Colello, 139 F.3d at 676.  As an equitable remedy, however, "disgorgement of improper profits" is "limited to 'restoring the status quo and ordering the return of that which rightfully belongs' to" another. Braunstein v. McCabe, 571 F.3d 108, 122 (1st Cir. 2009) (quoting Tull v. United States, 481 U.S. 412, 424 (1987)).  Because of this equitable limitation, disgorgement is properly applied only against third-party non-wrongdoers "who are in possession of funds to which they have no rightful claim."  SEC v. Ross, 504 F.3d 1130, 1141 (9th Cir. 2007); see also Contorinis, 743 F.3d at 306–07 (noting this application is "consistent with disgorgement's remedial purpose . . . [of] ensur[ing] illegal actions do not yield

unwarranted enrichment even to innocent parties"). If, by contrast, a relief defendant has a rightful claim to the funds, disgorgement is inappropriate. Ross, 504 F.3d at 1142.

Third, the two-part rule accounts for the nature of relief defendants. "[T]he lack of a legitimate claim to the [ill-gotten] funds is the defining element of a nominal [or, alternatively, relief] defendant." Colello, 139 F.3d at 677. The definition of a relief defendant is one who "holds the subject matter of the litigation in a subordinate or possessory capacity[,] as to which there is no dispute" -- and thereby lacks a legitimate claim to the property at issue. Id. at 676 (quoting Cherif, 933 F.2d at 414). That is why, courts have explained, relief defendants may "be joined to aid the recovery of relief" without an additional assertion of subject matter jurisdiction: they have possession but "no ownership interest" in the funds at issue and are joined simply to facilitate collection. Kimberlynn Creek Ranch, 276 F.3d at 191 (quoting Cherif, 933 F.2d at 414).

For all these reasons, we are persuaded by the reasoning of our sister circuits and hold that the SEC may obtain disgorgement from Sanchez-Diaz only if (1) she received ill-gotten funds, in the form of the 2017 BMW, and (2) she has no legitimate claim to those funds, i.e., to the BMW. The SEC, as the party seeking disgorgement, must establish both elements by a preponderance of the evidence. See Steadman v. SEC, 450 U.S. 91,

103-04 (1981); SEC v. World Cap. Mkt., Inc., 864 F.3d 996, 1004
(9th Cir. 2017).[3]   When a relief defendant such as Sanchez-Diaz
contests the SEC's request for disgorgement, however, she must put
forward a claim that is both legally and factually valid and cannot
rely solely on conclusory assertions.   See Kimberlynn Creek Ranch,
276 F.3d at 192 n.5.

> The parties do not dispute that the first element is met
here because Sanchez-Diaz has effectively conceded that the
proceeds of the underlying fraud paid for the BMW.   Accordingly,
this case hinges on the second element -- whether Sanchez-Diaz has
a "legitimate claim" to the 2017 BMW.   See Cavanagh, 155 F.3d at
136.   We turn our attention to that element now.

### B. Identifying a "Legitimate Claim"

> We have not developed guidelines for what qualifies as
a "legitimate claim" to unlawfully obtained proceeds, but our
sister circuits have.   Again, we find their reasoning persuasive
and rely on it here.

---

[3] Although the parties dispute who bears the burden of proving
the relief defendant's legitimate claim or lack thereof, neither
provides substantial briefing on this question.   Additionally, we
have not found any case law that persuasively argues that the
individual should bear the burden of proof when the government
brings a claim seeking to disgorge assets or property in the
individual's possession.   Even if we are incorrect and Sanchez-
Diaz had the burden of proof, she would have met it here based on
the largely undisputed facts before the district court.

To possess a legitimate claim to ill-gotten funds, a relief defendant must provide something of value in exchange.  See CFTC v. Walsh, 618 F.3d 218, 226 (2d Cir. 2010) ("[R]elief defendants who have provided some form of valuable consideration in good faith in return for proceeds of fraud are beyond the reach of the district court's disgorgement remedy."[4] (citing Janvey v. Adams, 588 F.3d 831, 834-35 (5th Cir. 2009))); Palmer, supra, § 19.7 (explaining that courts generally agree that "an innocent person who obtains a benefit through the wrongful act of a third person" can be ordered to pay restitution "to the one at whose expense the benefit was obtained, unless, in addition to [their] innocence, the recipient is protected because [they] gave value").[5]

That value can come in different forms.  It can include providing goods or performing services in exchange for

_____

[4] To be sure, the federal court in Walsh certified a particular question of New York state law to New York's highest court -- whether a spouse can be considered a "good faith purchaser for value" when she relinquishes future claims to marital property that consists almost entirely of proceeds of fraud.  618 F.3d at 231-32.  But the Walsh court agreed with the legal principle critical for our purposes here -- that when a relief defendant provides value in return for assets, those assets are not subject to disgorgement.  See id. at 226.

[5] The SEC has never argued that Sanchez-Diaz had any knowledge of Carrillo's fraud such that she would not qualify as "an innocent person."  To the contrary, the SEC repeated at oral argument that it was not alleging that Sanchez-Diaz was aware of the fraud.  Thus, notice of the underlying fraud is not at issue in this case, and we do not analyze how such notice could impact the parties' arguments.

compensation, such as when an employee performs work for an employer. See Kimberlynn Creek Ranch, 276 F.3d at 191-92 (finding that salary payments received in return for services rendered to an employer "constitute[] one type of ownership interest that would preclude proceeding against the [employee] as a nominal defendant"); Ross, 504 F.3d at 1142 (holding that relief defendants who were employed as sales agents for a company that violated securities laws had "presumptive title" to the commissions they "received [as] compensation in return for services rendered").

Value also can come from giving up a legal claim. Indeed, multiple courts have explained that a spouse may provide something of value by giving up, as part of a divorce agreement, a legal claim to marital property or child or spousal support. See Walsh, 618 F.3d at 226 (explaining that a relief defendant may provide value by relinquishing legal claims to marital property through a negotiated separation agreement); cf. Scholes v. Lehmann, 56 F.3d 750, 755-58 (7th Cir. 1995) (stating that a spouse who received proceeds of fraud could provide more than nominal consideration through "discharge of [her former husband's] . . . obligations of child support and the like arising from their divorce").

By contrast, courts agree that when a relief defendant receives property "as a gift," there is no "'legitimate claim' sufficient to immunize the property from disgorgement." Walsh,

-16-

618 F.3d at 226; see also George, 426 F.3d at 798; Cavanagh, 155 F.3d at 137.   Consistent with the need to distinguish between gifts and value-backed exchanges, a relief defendant must provide more than nominal value to demonstrate a legitimate claim.   See Restatement (Third) of Restitution and Unjust Enrichment § 68, cmt. c, illus. 4 (Am. L. Inst. 2011).   For example, in Janvey, the Fifth Circuit held that creditors who signed a written agreement granting them "certain rights and obligations" with respect to funds, before the SEC enforcement action began, had a legitimate claim and were improper relief defendants.   588 F.3d at 834-35. By contrast, in World Capital Market, the Ninth Circuit upheld a disgorgement order when the evidence showed that the named defendant's alleged $5 million loan to the relief defendant was a sham designed to minimize the amount of the named defendant's assets.   864 F.3d at 1004-05.   To support its ruling, the court pointed to the fact that the relief defendant disclaimed any legal obligation to repay the loan.   Id.

Accordingly, to exclude the possibility of a gift, the value that a relief defendant provides in exchange for ill-gotten gains must be more than nominal in relation to the funds received. But no federal disgorgement precedent suggests that the value must be substantially equal.   Rather, courts have viewed their task as "merely ensuring a non-specious claim to the funds."   CFTC v. WeCorp, Inc., 848 F. Supp. 2d 1195, 1205-06 (D. Haw. 2012)

-17-

(rejecting agency's argument that relief-defendant attorney did not have a legitimate claim to a retainer because he did not provide services that were "reasonably equivalent" to the retainer's value); see also Kimberlynn Creek Ranch, 276 F.3d at 192 (explaining that a specious claim of ownership will not allow individuals who hold funds on behalf of wrongdoers to avoid disgorgement).  This is for good reason.  Under general equitable principles, innocent third parties can assert a defense to restitution claims premised on unjust enrichment by demonstrating that they gave value in return.  Palmer, supra, § 16.6; Restatement (Third) of Restitution and Unjust Enrichment § 68 cmt. c (Am. L. Inst. 2011).  As long as the individual provided more than nominal consideration, courts generally refrain from inquiring into the adequacy of the consideration.  See Restatement (Third) of Restitution and Unjust Enrichment § 68, cmt. c, illus. 4 (Am. L. Inst. 2011); Dobbs & Roberts, supra, § 4.6(2) (explaining that, even if one party received a payment worth more than the value of the debt it discharged in return, the party may still have a defense to restitution and that courts are correct not to investigate the value of the right to recover against the debtor); Palmer, supra, § 16.6 (referencing pragmatic reasons for declining to inquire into the worth of a valid claim one party has discharged, including the difficulties of ascertaining value).

The district court here, however, took a different approach.  It determined that the relevant question was not "whether there existed 'consideration' in the contract law sense but whether Sanchez[-]Diaz provided substantially equivalent value in the bankruptcy law sense."[6]  Carrillo, 656 F. Supp. 3d at 355-56.  The SEC's argument at the disgorgement motion hearing seems to have inspired the district court's bankruptcy-law framing.  The SEC contended that Sanchez-Diaz did not give "equivalent value in exchange" for Carrillo's obligation to provide her with a car, and the question of whether she gave "equivalent value" was the central issue before the district court.

---

[6] The concept of "reasonably equivalent value," meaning "roughly equivalent value," is central to the law of fraudulent transfer under the Bankruptcy Code, in which a bankruptcy trustee can undo and recover a transfer of property from a debtor to a third party.  2 Bankruptcy Law Manual § 9:36 (5th ed. 2023).  The Bankruptcy Code permits a trustee to recover transfers that a debtor made before the debtor declared bankruptcy if the trustee can show, among other things, that at the time of the transfer, the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(i); see In re Palladino, 942 F.3d 55, 58-59 (1st Cir. 2019).  Although the term "reasonably equivalent value" appears in the statute's text, it is not defined in the statute, so courts have given it meaning.  See In re R.M.L., Inc., 92 F.3d 139, 153 (3d Cir. 1996) (explaining that courts consider factors such as the fair market value of the item received by, or the services performed for, the debtor compared to the actual price paid; the existence of an arm's-length relationship between the debtor and the transferee; and the good faith of the transferee). Critically, the term "reasonably equivalent value" does not appear in the text of the SEC disgorgement statute.

Neither the district court nor the SEC has cited support for the application of this bankruptcy-law framing to SEC disgorgement motions. After careful consideration, we also find no basis for it in the language of the operative federal statute or in precedent, including the cases cited by the district court. Instead, those cases merely stand for the well-accepted principle that a relief defendant has a legitimate claim to property or funds only if they have provided some consideration, such as in the form of goods or services, in exchange.

To be sure, when parties have disputed whether the relief defendant has a legitimate claim based on services rendered, lower courts have examined the amount of money a relief defendant received in light of the services purportedly provided. See, e.g., WeCorp, 848 F. Supp. 2d at 1202; SEC v. Erwin, No. 13-cv-03363, 2022 WL 2063227, at *3-4 (D. Colo. June 8, 2022); SEC v. Nadel, No. 11-0215, 2016 WL 639063, at *29 (E.D.N.Y. Feb. 11, 2016); SEC v. End of the Rainbow Partners, LLC, No. 17-cv-02670, 2019 WL 8348323, at *7 (D. Colo. Nov. 25, 2019). Courts have taken a particularly close look in cases in which relief defendants have received substantial sums of money for ministerial tasks. See, e.g., Erwin, 2022 WL 2063227, at *3-4; Nadel, 2016 WL 639063, at *29; End of the Rainbow Partners, 2019 WL 8348323, at *7. The courts' inquiries, however, were aimed at distinguishing earned compensation from gratuitous transfers. See, e.g., Erwin, 2022

WL 2063227, at *3-4.  The courts did not require that the relief defendants furnish "equivalent value" to assert a legitimate claim.  And no case that we have found suggests that, if a relief defendant provides more than nominal value, the court should nevertheless scrutinize if that value were truly sufficient, by some market-based or other external measure.

Indeed, "disgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions," and the applicable statutory provision here focuses on the concept of unjust enrichment. Bronson Partners, 654 F.3d at 372; see also 15 U.S.C. § 78u(d)(3)(A)(ii).  A disgorgement order is aimed at requiring the return of that which belongs equitably and in good conscience to another.  Braunstein, 571 F.3d at 122.  It is, therefore, available against innocent third parties.  Ross, 504 F.3d at 1141. If a relief defendant has provided some value that is more than nominal in exchange for an asset, however, they do have a rightful claim to that asset, even if some accounting could suggest they obtained it at a discount.  Launching small-scale adjudications on how much of the relief defendant's discount is valid or the precise fair market value of the relief defendant's services would require the relief defendant to satisfy a mathematical analysis, rather than determine the relevant question of whether they have a just claim.  Compare Janvey, 588 F.3d at 834-35 (finding that

the existence of a creditor-debtor relationship before the enforcement action was itself enough to give relief defendant-creditors a legitimate ownership interest in proceeds received through the agreement), with In re Palladino, 942 F.3d at 59 (confronting a valid creditor-debtor relationship in the bankruptcy law context and then, nevertheless, proceeding to examine whether the debtors' transfer provided reasonably equivalent value to creditors); see also Dobbs & Roberts, supra, § 4.1(1) (contrasting restitutionary recovery through remedies like disgorgement with recovery of damages).

To sum up, we conclude that a relief defendant in an SEC enforcement action has a legitimate claim to funds if (i) they have provided something of value in exchange, whether that be services as an employee or an agreement to give up a legal claim, as just two examples, and (ii) the value they provided is more than nominal in relation to the money received.[7]  With that legal standard in place, we turn to whether Sanchez-Diaz satisfies it.

---

[7] In so holding, we emphasize that "more than nominal" is not an absolute number.  Rather, courts should determine in the context of a particular case whether the value that a relief defendant provided is more than nominal in relation to the funds received.  For example, five dollars for a new Rolls Royce would not be more than nominal.  Courts evaluating the services that a relief defendant has provided have used this type of analysis by evaluating whether the money the relief defendant received is related to the scope and duration of the services.  See, e.g., Nadel, 2016 WL 639063, at *29.

### C. Application

Sanchez-Diaz received the car through the parties' modified child custody and support agreement.  Under that 2016 agreement, (i) Carrillo agreed to cover a number of expenses involved in raising their son, including transportation, and (ii) Sanchez-Diaz agreed to sole legal and physical custody of their son.  We conclude that, through this agreement, Sanchez-Diaz conveyed much more than nominal value in exchange for Carrillo's promise to purchase the 2017 BMW.  Accordingly, we determine that the district court clearly erred in holding otherwise.

### 1. Acceptance of Legal and Physical Custody

By accepting sole legal and physical custody of their son under the 2016 agreement, Sanchez-Diaz agreed to be fully responsible for every aspect of their son's life for the next five to six years -- i.e., until he turned nineteen or started college.  The significant effort involved in raising a child, and the obligation of full legal and physical custody, certainly constitutes the provision of value in exchange for Carrillo's monetary support, including the car.

Our conclusion rests not only on a practical understanding of the realities of raising a child but also on decades of research and legal recognition of what caring for a child entails.  For instance, California law presumes, in the context of child support, "that a parent having primary physical

responsibility for [a child] contributes a significant portion of available resources for the support of [that child]." Cal. Fam. Code § 4053(i).  Similarly, research has long documented the significant time single parents spend on childcare and household activities.  On average, single parents can spend as much as six-and-a-half hours per day with their children, not counting the time spent engaged in housework.  Sarah M. Kendig & Suzanne M. Bianchi, Single, Cohabitating, and Married Mothers' Time with Children, 70 J. Marriage & Fam. 1228, 1237 (2008); D'Vera Cohn, Gretchen Livingston & Wendy Wang, After Decades of Decline, A Rise in Stay-at-Home Mothers, Pew Rsch. Ctr. 21 (Apr. 8, 2014), https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2014/04/Moms-At-Home_04-08-2014.pdf. And, of course, it is well understood that parents and caregivers are central to creating the conditions that allow for a child's healthy development, including through the time they spend directly with that child.  See Beth A. Kotchick & Rex Forehand, Putting Parenting in Perspective: A Discussion of the Contextual Factors That Shape Parenting Practices, 11 J. Child & Fam. Stud. 255, 255 (2002).  The important contributions that parents make to their family by caring for their children are also recognized in the equitable distribution of property upon divorce.  See Barth H. Goldberg, Valuation of Divorce Assets § 10:4 (2023).

Accordingly, this case is very different from cases in which a relief defendant provided limited menial tasks in exchange for a large sum of money, suggesting that the money was merely a gift. See, e.g., Erwin, 2022 WL 2063227, at *3-4. It is also different from situations in which a wrongdoer uses a relief defendant as a mere conduit to hide proceeds from the underlying illegal activity. See, e.g., World Cap. Mkt., 864 F.3d at 1004-05. Here, the car was just one of the resources Carrillo committed to provide through a valid child support and custody agreement. And as Sanchez-Diaz explained in her declaration below, she primarily used the car to drive their son to and from school and extracurriculars -- i.e., in fulfillment of the custodial obligations she had under the agreement. See Janvey, 588 F.3d at 834-35.

The SEC contends, however, that Sanchez-Diaz did not provide any value in return for the BMW because she did not undertake new obligations through the 2016 agreement. It claims that she had already accepted custody of the parties' son under the earlier 2009 marital termination agreement. But the SEC overlooks a major change in circumstances that occurred after 2009: Carrillo left the country and moved to Mexico in late 2013. Under the 2009 agreement, Carrillo consented to a set schedule for sharing the care of their son: he had the son every other weekend and on alternating school holidays, school vacations, and

birthdays.  After Carrillo moved to Mexico and since early 2014, however, Sanchez-Diaz, who continued to reside with their son in California, had sole physical custody.  She and Carrillo then executed the 2016 agreement to reflect their new arrangement for the care of their son, which had been in effect in practice since Carrillo left the country.

The district court discussed neither Sanchez-Diaz's obligations under the 2016 agreement nor the change in circumstances after Carrillo left the country, both of which Sanchez-Diaz detailed in her declaration.  Rather, the district court simply rejected her declaration and concluded that Sanchez-Diaz had provided nothing of value, even though the SEC did not contest the basic facts of the 2009 and 2016 agreements or that Carrillo moved out of the country in late 2013.

### 2. Forbearance on a Legal Claim

In addition to accepting sole legal and physical custody of their son, Sanchez-Diaz conveyed a second form of value under the 2016 agreement: She gave up the right to return to court to seek modification of the 2009 child support order and instead agreed to resolve the issues at stake through a settlement with Carrillo.  An agreement to forbear on a legal claim constitutes an exchange of value that gives a relief defendant a legitimate claim to assets received in return.  See Walsh, 618 F.3d at 222, 226.  Although the SEC hints there is something suspicious about

-26-

the 2016 agreement given its allegation that Carrillo's fraud began in 2013, renegotiation of child support orders in light of changed circumstances is, in fact, a normal occurrence.  See Cal. Fam. Code § 3651(a) (providing that an order of child support "may be modified or terminated at any time as the court determines to be necessary"); Determining Child & Spousal Support § 6:37 (2023) ("[A]ll states permit modification of child support on a showing of changed circumstances since the entry of the prior order.").

Importantly, between the 2009 and 2016 agreements, Carrillo moved to Mexico, and their son neared his teenage years. The increased cost of raising older children is one common reason that parents seek modification of a child support order.  See J. Thomas Oldham, Abating the Feminization of Poverty: Changing the Rules Governing Post-Decree Modification of Child Support Obligations, 1994 BYU L. Rev. 841, 845 (explaining that parents should be able to request modification of child support when their children age, given that "most families spend more on teenage children than they do on younger ones"); see also Robert D. Broughton, Jr., Modification of Child Support Orders Under the Uniform Interstate Family Support Act (UIFSA), Army Law. Dec. 2004, at 57 (explaining that modification of a child support order can be warranted because "[t]he costs of raising a child, the needs of a child, and the financial circumstances of the parents may all change dramatically over time," and an agreement entered when a

child is young may not account for the costs of raising a teenager).

Because, in return for the resources she received through the 2016 child support agreement, Sanchez-Diaz (i) provided services, by taking on sole legal and physical custody of their son, and (ii) surrendered a potential legal claim, the district court's factual finding that she provided no value is not "plausible in light of the record viewed in its entirety." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 35 (1st Cir. 2008) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985)).  Instead, "we are left with a 'strong, unyielding conviction that the district court was mistaken.'"  Benham v. Lenox Sav. Bank, 292 F.3d 46, 48 (1st Cir. 2002) (quoting Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 46 (1st Cir. 1995)).

### D. Disgorgement Is Not Available Against Sanchez-Diaz

In summary, Sanchez-Diaz provided value in exchange for the car.  The value she provided was more than nominal and therefore satisfies our legal standard.  The district court erred as a matter of law by evaluating if that value was "substantially equivalent" in the bankruptcy law sense.  And its finding that Sanchez-Diaz provided no value at all, despite the facts in the record showing that she took on full legal and physical custody of the parties' son and gave up a legal claim against her ex-husband,

was clearly erroneous.  Accordingly, no basis exists to subject Sanchez-Diaz to disgorgement.[8]

## IV. CONCLUSION

For all these reasons, we **reverse** the district court's disgorgement order.

---

[8] Because we conclude that disgorgement against Sanchez-Diaz is not an available remedy and reverse on that ground, we need not address her arguments that the remedy the SEC seeks from her is punitive or that requiring her to pay disgorgement violates her Fifth and Eighth Amendment rights.